UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TAWANNA L. WHITEHEAD,<br>*Plaintiff*,<br>v.<br>CITY OF ALLENTOWN,<br>*Defendant*. | No. 5:24-cv-06396 |

**MEMORANDUM**

Presently before the Court is the City of Allentown's (City or Allentown) Motion for Summary Judgment and accompanying Brief in Support thereof (Dkt. 38). In her Complaint, Tawanna Whitehead (Plaintiff) raises one claim, asserting she experienced a hostile work environment on account of race. *See* Complaint (Dkt. 1) at ¶¶ 52–54. She alleges violations of both the Pennsylvania Human Relations Act (PHRA), 43 P.S. §§ 951–963, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17.[1] For the reasons that follow, the City's Motion for Summary Judgment is granted.

## I. Background

Plaintiff "is an African American female, who has worked as the Deputy City Clerk of Allentown since 2010." Joint Statement of Stipulated Facts (Joint Statement) (Dkt. 38-7) at ¶ 1 (citation omitted). She worked in an office suite that

[1] The PHRA is "coextensive with the applicable federal law," and therefore "courts … generally interpret the PHRA in accord with its federal counterparts[.]" *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 150 n.1 (3d Cir. 2017) (citation omitted).

"shared space with the City Solicitor's Office and was on the same floor as City Council offices." *Id.* at ¶ 2 (citation omitted). On October 17, 2023, Plaintiff "filed a Charge of Discrimination with the [Equal Employment Opportunity Commission (EEOC)] docketed at No. 530-2024-00178, which is the only external charge of discrimination [Plaintiff] has filed with regards to her employment with the City of Allentown." *Id.* at ¶ 3.

To provide a factual basis for her claim for relief, Plaintiff raises several allegedly discriminatory incidents. Her specific allegations are described below.[2]

**October 2015—Dale Wiles**

Dale Wiles was a "former Assistant Solicitor of Allentown, [who] did not have the ability to hire or fire city employees, or set or change city employee compensation." Joint Statement at ¶ 8 (citation omitted). According to Plaintiff, Wiles used the term '[s]and [n*****]' in Plaintiff's presence." Plaintiff's Brief Opposing Defendant's Motion for Summary Judgment (Response) (Dkt. 42) at 5 (emphasis removed) (citation omitted). Plaintiff avers Wiles used the term three times, twice in Plaintiff's presence. *Id.* Wiles "was ultimately terminated by [the City]." Joint Statement at ¶ 9.

**2018—Candida Affa**

Candida Affa "is an Allentown Councilperson who was first elected to

---

[2] As the Court will explain below, even after discovery, Plaintiff has failed to allege she suffered a legally cognizable injury. Because Plaintiff is the nonmoving party, it will therefore suffice here to draw primarily from the Joint Statement of Stipulated Facts and from her response to the Motion for Summary Judgment. *See Watson v. Pennsylvania*, No. 4:07-cv-2048, 2009 WL 151595, at *1 (M.D. Pa. Jan. 21, 2009) ("In evaluating a motion for summary judgment the court will draw all reasonable inferences from the evidence in the record in favor of the nonmoving party." (citing *Am. Flint Glass Workers Union, AFL-CIO v. Beaumont Glass Co.*, 62 F.3d 574, 578 (3d Cir. 1995)).

Allentown City Council in 2015." *Id.* at ¶ 7 (citation omitted). Plaintiff asserts that in 2018, "[a]fter a Hispanic man who was acting erratically was shot at nearby Dorney Park, Affa commented that if the victim's family had 'put a leash on him' he would not be dead." Response at 5 (emphasis removed) (citation omitted).

**2019—Affa**

Plaintiff further claims that in 2019, after "an organization run by an African American made a budget request to City Council[,]" Plaintiff allegedly heard Affa state "they are always begging, they don't want to work, and don't want to educate themselves[.]" *Id.* at 6; Plaintiff's 9/4/2025 Deposition (Dkt. 38-2) at 80.

**2020—Councilperson Daryl Hendricks**

Daryl Hendricks was a member of the City Council. Joint Statement at ¶ 6. Plaintiff contends that in 2020, Hendricks said to Plaintiff, "the problem with you people, you don't have leaders." Plaintiff's Deposition at 24. Plaintiff stated the comment was directed to her and "took it to mean [her] race[.]" *Id.* at 25.

**2020—Affa**

Plaintiff insists that "on or around" June and July 2020, Affa "stated that it doesn't take a village, specifically insinuating Black people should be able to raise their own children." Response at 6 (emphasis removed) (citation omitted). Additionally, Plaintiff claims Affa said in 2020, "Black lives matter, what does that mean?" Plaintiff's Deposition at 129. In her deposition, Plaintiff elaborated, "So, to me, it's like she questioned, why do[] Black lives matter? Are they asking for something? Because she's gay and not demanding anything." *Id.* at 132; Response

at 7. Also in 2020, Plaintiff contends Affa "said that when she owned her bar, the minorities were causing all the issues. She added that when the neighborhood resisted her gay bar, she told them, 'well if you don't want my bar here then I'll sell it to a Black person.'" Response at 6–7 (emphases omitted) (citations omitted).

During that same year, Plaintiff asserts Affa stated "Black people could not even educate themselves" following a "request from the Black community that an Associate's degree no longer be required to join the police department." *Id.* at 8 (emphasis removed) (citation omitted).[3] Although the City offered "cultural sensitivity training in September and October 2020," Plaintiff emphasizes it was not mandatory. *Id.*

**<u>2023—Affa</u>**

Finally, Plaintiff alleges that during a September 2023 city council meeting, Affa "referenced Plaintiff by name during remarks while trying to convince the public that she's not a racist" and stated "people need to walk in a White person's shoes to understand." *Id.* at 9 (emphasis removed) (citations and footnote omitted).

Later that month, "[o]n September 26, 2023, an incident occurred between [Plaintiff] and [ ] Affa while [Plaintiff] was helping [ ] Affa with the Uber app on [ ] Affa's phone." Joint Statement at ¶ 18 (citations omitted). Plaintiff gave the following version of events during her deposition:

Q. [Y]ou asked Miss Affa if you could ask her a question?

A. Yes.

---

[3] Plaintiff also claimed that "at some point … after January 2022[,]" Affa commented, "I don't know why Black people complain about hanging, because Italians were hung more [than Black people]." *Id.* at 8 (emphasis removed) (alteration in original) (citation omitted).

Q. And what was the question you wanted to ask her?

A. I was going to ask her not to mention my name in a public forum.

Q. When you stated to her you wanted to ask her a question, how -- did she say, yeah, ask me a question? Or did she say no? Or what was the --

A. She pulled down her mask and she was like, I don't care what a Black person has to say. … Fuck Justin. fuck Barbara. fuck everyone. And I'm like, are you saying fuck me? And she said, yes, fuck you, too.

Q. Was anyone else present when this occurred?

A. Mike [Hanlon[4]] was in his office with the door closed.

Q. After you asked her if she's talking about you, too, any other conversation after that?

A. She went in Mike's office, slammed the door.

…

Q. Did you hear any discussion between Miss Affa and Mr. Hanlon after she went in his office?

A. No, I did not.

Q. How long was she in Mr. Hanlon's office?

A. Give or take ten minutes.

Q. And then what happened next?

A. She leaves the office. Mike then comes out.

Q. When she -- any further -- after she leaves Mr. Hanlon's office, any further discussion or communications with you?

A. No.

---

4 Mike Hanlon "has been the City Clerk of Allentown since 1991." Joint Statement at ¶ 4.

> Q. And did you try to say anything to her on her way out?
>
> A. No.
>
> Q. What happens next?
>
> A. Mike comes out of his office and I said to him, I know you don't want to get involved. And I explained what she -- Miss Candida Affa did. And I said, she said that she doesn't care what a Black person has to say. And fuck Justin. Fuck Barbara. Fuck everyone. And then I ask her, are you saying fuck me? And she said, yes, and fuck you, too. And then Mike didn't say anything.

Plaintiff's Deposition at 165–69.

The version Affa provided in her deposition differs from Plaintiff's version:

> A. [S]he was helping me with my phone, and at this point, we were having a vote on an investigation, and she started asking me about it.
>
> And I asked her to not go there because it was very sensitive to me, this thing. And she said --- oh, I said to her, I have a lot of friends that are involved in this, and I didn't even discuss this with anyone, and I'd rather not go there.
>
> So she insisted. She asked again, and I said, Tawanna. I was a little more firm this time. I said, Tawanna, do not go there. And she said to me, that's the problem. And she pointed at me and turned around and said, you are the problem. And at that point, I said, fuck you, and walked away.

Affa Deposition (Dkt. 38-3) at 34. When asked if she said she "does not care what a black person says and started screaming, fuck Justin, fuck Barbara, and fuck everyone[,]" Affa responded "Not true." *Id.* at 65. She also denied repeating that sentiment when she called to apologize to Plaintiff. *Id.* at 67.

In early October, the City Council President and Vice President interviewed Plaintiff about the incident. Joint Statement at ¶ 19 (citations omitted). In November, the City "sent [Plaintiff] a letter summarizing the results of their

investigation into the September 26, 2023 incident finding that [ ] Affa acted inappropriately." *Id.* at ¶ 20. The letter informed Plaintiff that "appropriate action had been taken to ensure that such conduct does not repeat itself and that if [Plaintiff] should experience any further problems, that she should inform [the City] who would deal with such misconduct 'swiftly and severely.'" *Id.* at ¶ 21 (citations omitted). The letter also indicated Plaintiff "should not hesitate to ask questions or speak up about matters that concern her." *Id.* at ¶ 22 (citations omitted).

In December, the City gave Plaintiff an additional letter, "indicating that the City would like to provide [Plaintiff] with different options that are available to her to further limit her contact with [ ] Affa going forward[.]" *Id.* at ¶ 25. Those options included:

> (1) remote work[;] (2) moving her work location in the office to a different location away from [ ] Affa; (3) requiring another councilperson or the City Clerk to be present during any interactions between [Plaintiff] and [ ] Affa; and/or (4) transferring [Plaintiff] to a vacant position in a different department in Allentown at the same rate of pay and benefits.

*Id.* (citations omitted). That letter further advised Plaintiff she "was not required to accept any of the options but all options remain[ed] available to her and she should contact Allentown to assist in making the necessary changes." *Id.* at ¶ 26 (citation omitted).[5]

[5] Additionally, Plaintiff raised two allegedly discriminatory incidents at the 2019 and 2021 Allentown Safety, Health, and Wellness Days. *See* Plaintiff's Deposition at 135–41. In her Response, Plaintiff does not refute the City's argument that no racially motivated conduct occurred at these events. Thus, there is no dispute of material fact, and the Court consequently does not address those incidents here. *See Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (Once the moving party has met its burden of establishing the absence of a genuine issue of material fact, the "burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." (citations, quotation marks, and emphasis removed)).

## II. Analysis

### A. Standard for Granting Summary Judgment

When considering a motion for summary judgment, courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed fact is "material" only if it "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Courts must "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Savane v. Sec'y United States Dep't of Homeland Sec.*, 164 F.4th 93, 98 (3d Cir. 2026).

### B. Failure to Exhaust Administrative Remedies

To succeed on a hostile work environment claim, a plaintiff must first "exhaust all required administrative remedies[.]" *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 163 (3d Cir. 2013) (citation omitted). This means "a plaintiff must file a charge of discrimination with the EEOC and procure a notice of the right to sue." *Id.* (citation omitted). "The same is required to bring a claim under the PHRA." *Id.* (citation omitted).

Plaintiffs must "file the charge with the EEOC within 300 days of the employment practice;" otherwise, the "claim is time barred[.]" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002). The PHRA imposes a 180-day time limit. 43 P.S. § 959(h) ("Any complaint filed pursuant to this section must be so filed within one hundred eighty days after the alleged act of discrimination[.]").

Here, Plaintiff filed her "only external charge of discrimination" with EEOC on October 17, 2023. Joint Statement at ¶ 3. The City therefore argues that any alleged conduct occurring before April 20, 2023, is time barred from her PHRA claim, and any alleged conduct occurring before December 21, 2022, is time barred from her Title VII claim. As a consequence, the City posits this Court may only consider the allegations concerning Affa in September 2023.

**C. The Continuing Violation Doctrine**

To permit this Court to consider events occurring outside the statutory time limits, Plaintiff attempts to invoke the continuing violation doctrine. The continuing violation doctrine provides that "discriminatory acts that are not individually actionable may be aggregated to make out a hostile work environment claim; such acts can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period." *Mandel*, 706 F.3d at 165 (citation and quotation marks omitted). "To allege a continuing violation, the plaintiff must show that all acts which constitute the claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period." *Mandel*, 706 F.3d at 165–66 (citations omitted).

The continuing violation doctrine is especially relevant in this context "precisely because the entire hostile work environment encompasses a single unlawful employment practice[.]" *Morgan*, 536 U.S. at 117. Title VII "does not separate individual acts that are part of the hostile environment claim from the whole for the purposes of timely filing and liability." *Id.* at 118. Because "incidents

constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim." *Id.* Consequently, for "the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment." *Id.* The Court will therefore consider all of the incidents described above.

**D. Elements of a Hostile Work Environment Claim**

To succeed in bringing a Title VII hostile work environment claim against an employer, a plaintiff must establish the following five elements: "1) the employee suffered intentional discrimination because of his/her [race], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability[.]" *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (alteration in original) (citation omitted). The "first four elements of this claim establish that a hostile work environment existed. The fifth element … establishes the basis on which to hold the employer liable." *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009). Plaintiff has failed to satisfy the requisite elements, particularly the second and fifth.

**1. Severe or pervasive discrimination.**

"Whether an environment is hostile requires looking at the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance;

and whether it unreasonably interferes with an employee's work performance." *Castleberry*, 863 F.3d at 264 (citation and quotation marks omitted). Additionally, "[f]or discrimination to constitute severe or pervasive behavior, it must 'alter the conditions of [the victim's] employment and create an abusive working environment.'" *Nitkin v. Main Line Health*, 67 F.4th 565, 570 (3d Cir. 2023) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

Here, Plaintiff cannot demonstrate that the conduct was severe or pervasive. In *Nitkin v. Main Line Health*, the Third Circuit considered a claim involving "seven comments … spread out over a span of over three-and-a-half years." 67 F.4th 565, 571 (3d Cir. 2023). This "relative infrequency … reflecting one or two statements in a given six-month period" led the Court to conclude the conduct was "not severe or pervasive harassment." *Id.* (citation omitted); *see also id.* at 572 (giving examples from other circuits holding "infrequent offensive utterances are not severe or pervasive," such as seven insensitive comments made during a span of over three years and eight lewd remarks from a supervisor over the course of several years).

Nevertheless, because the standard is severe *or* pervasive discrimination, "some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." *Castleberry*, 863 F.3d at 264 (citation omitted). Indeed, a "supervisor's single use of the 'n-word' … can suffice to state a claim[,]" although it is still a "context-specific" question. *Id.* (citations omitted). In *Castleberry*, plaintiffs "alleged that their supervisor used a racially charged slur in front of them and their non-

African-American coworkers. Within the same breath, the use of this word was accompanied by threats of termination (which ultimately occurred)." *Id.* at 265. The Court held that was "severe conduct that could create a hostile work environment[,]" further stressing that the plaintiffs could show pervasive conduct because their sign-in sheets bore racially discriminatory comments on several occasions and they were assigned more menial tasks. *Id.* at 265–66.

In this case, Plaintiff alleges there were several offensive comments made by different people over an eight-year period. Years passed between some of the comments. Moreover, the uses of the n-word were not directed towards Plaintiff, were not made by Plaintiff's supervisor, did not reoccur in eight years, and the allegedly offending employee was terminated. Under the governing caselaw, these allegations do not rise to the level of severe or pervasive discrimination. As in *Nitkin*, "[n]o rational jury, following the law, could conclude otherwise." *See Nitkin*, 67 F.4th at 573. Plaintiff therefore fails to satisfy this element of her claim.

**2. *Respondeat superior* liability.**

Additionally, Plaintiff cannot establish *respondeat superior* liability. Generally, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created *by a supervisor* with immediate (or successively higher) *authority over the employee*." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) (emphases added). Clarifying the definition of "supervisor," the Supreme Court held that "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible

employment actions against the victim[.]" *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). More specifically, a supervisor is empowered "to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 431 (citation and quotation marks omitted).

In this matter, the incidents at issue involve comments allegedly made by two members of City Council (Affa and Hendricks) and one former assistant city solicitor (Wiles). It is undisputed that Wiles "did not have the ability to hire or fire city employees, or set or change city employee compensation." Joint Statement at ¶ 8 (citation omitted). It is further undisputed that "City Council does not have the authority to raise or lower Allentown employee salaries or terminate or promote Allentown Employees." *Id.* at ¶ 14 (citation omitted). Consequently, none of the individuals in question could "take tangible employment actions against" Plaintiff, *see Vance*, 570 U.S. at 424, and therefore were not supervisors.

Still, "[i]f the harassing employee is the victim's co-worker," the employer can be liable "if it was negligent in controlling working conditions." *Id.* Wiles was certainly Plaintiff's co-worker. It is, however, undisputed that "City Council members are elected officials and not employees of Allentown, and Allentown cannot terminate any member of City Council." Joint Statement at ¶ 11 (citation omitted). Whether the councilpersons were co-workers is therefore questionable. Despite this, an employer "may be liable under Title VII for the harassing conduct of third parties if the employer was aware of the conduct and failed to take reasonable remedial action

in response." *Johnson v. Bally's Atl. City*, 147 F. App'x 284, 286 (3d Cir. 2005) (citing *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1073–74 (10th Cir. 1998)). Accordingly, the issue is whether a reasonable jury could conclude the City was negligent in controlling the working environment.

Considering the record presently before this Court, a reasonable jury could not reach that conclusion. An employer is negligent with regard to a hostile work environment "if the employer knew or reasonably should have known about the harassment but failed to take remedial action." *Vance*, 570 U.S. at 427 (citation omitted).

Beginning with the 2015 accusations against Wiles, Plaintiff reported the issue, it was escalated and addressed, the employee was eventually terminated, and Plaintiff was not exposed to the racial slur at work again. Plaintiff's Deposition at 56–64.

Plaintiff's claims regarding Affa's comments in 2018, 2019, and 2020 do not fare any better. The alleged comments were not directed at Plaintiff, and Plaintiff acknowledged the comments were not intended to harass her and were addressed through internal reporting, training, and investigation. *Id.* at 74–97, 119–134.

The 2020 allegation involving Hendricks was an isolated comment, separated by months or years from the other allegations, Hendricks apologized to Plaintiff, Plaintiff accepted the apology as sincere, and there was no further incident. *Id.* at 26–33.

With respect to the most recent allegations involving Affa from September

2023, there is no basis for a jury to conclude the City was negligent. As described above, the incident was promptly investigated, Affa was given a written admonishment, the City offered Plaintiff numerous accommodations, and Plaintiff does not allege Affa made any subsequent harassing comments.

Finally, it is worth noting that the City was somewhat limited in the power it had over the members of City Council, who "are elected officials and not employees of Allentown[.]" Joint Statement at ¶ 11 (citation omitted). The parties agree that "Allentown cannot tell City Council what to do in terms of censoring its members or mandating training." *Id.* at ¶ 12 (citation omitted). Thus, the City's ability to take remedial action was constrained by the nature of its relationship to the City Council.

In sum, Plaintiff's inability to establish *respondeat superior* liability provides an alternative basis (in addition to the discussion of severity and pervasiveness above) for granting summary judgment.

## III. CONCLUSION

For the foregoing reasons, the City has shown there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Therefore, the City's Motion for Summary Judgment is granted. An appropriate order follows.

DATED: August 28, 2026

BY THE COURT:



GAIL WEILHEIMER J.